IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHERINE O'SHEA, BRIAN POSNER, AND TOM BACON, on behalf of themselves, and all other plaintiffs similarly situated, known and unknown,<br><br>Plaintiffs,<br><br>v.<br><br>MAPLEBEAR INC. D/B/A INSTACART AND "DOES" 1 through 100, Inclusive,<br><br>Defendants. | 19 C 06994<br><br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

For the reasons set forth below, Defendant Maplebear Inc.'s motion to compel arbitration [30] is granted. The plaintiffs' claims must be submitted to individual arbitration; pending arbitration, this matter is stayed. Plaintiffs are directed to notify the Court within 14 days of the issuance of any arbitration award or other action that terminates arbitration proceedings or otherwise concludes this matter.

## BACKGROUND

Plaintiffs Katherine O'Shea, Brian Posner, and Tom Bacon bring this action on behalf of themselves and similarly situated persons working as personal shoppers, drivers, and delivery persons for Instacart (collectively, "Shoppers") in Illinois. *See* Compl., ECF No. 1. The plaintiffs assert a number of federal and state law claims against Defendant Maplebear Inc. d/b/a/ Instacart, including violations of the Fair Labor Standards Act, the Illinois Wage Payment and Collection Act, the Illinois Minimum Wage Law, the Cook County Minimum Wage Ordinance, the Chicago Minimum Wage Ordinance, the Unfair and Deceptive Business Practices Act, and common law

claims for tortious interference with prospective economic advantage, conversion, and fraud and intentional misrepresentation. *Id.* ¶¶ 10-18. Instacart has moved to compel individual arbitration of the plaintiffs' claims pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 2, 3, 4, and to stay these proceedings pending resolution of those individual arbitrations. Def.'s Mot. Compel Arbitration, ECF No. 30.

Instacart is a California-based technology company that connects customers and Shoppers via the Instacart website and its smartphone application to facilitate same-day, on-demand grocery shopping and delivery services in major metropolitan areas, including within the State of Illinois. Def.'s Memo. Supp. 1, ECF No. 31. Customers place orders for groceries from local grocery stores through Instacart's website or app. Customers' "batches" are then assigned to Shoppers in the vicinity of the selected grocery store; a Shopper goes to the store, collects the customer's desired items (and can communicate directly with the customer, through the app, about substitutions or with questions about their selections), and delivers the batch directly to the customer. *Id.* Information is relayed through the Instacart app continuously throughout the process: a Shopper is assigned to the "batch" through the app, and the customer is notified when the Shopper arrives at the store, when the Shopper has picked up items from their order, and when the Shopper's trip is complete and they are en route for delivery. Pls.' Memo. Opp'n 2, ECF No. 42.

To become an Instacart Shopper, applicants must review and sign the Independent Contractor Agreement, which governs the relationship between Instacart and its Shoppers. Def.'s Memo. Supp. 2. Shopper paperwork is done through a third-party product, HelloWorks. *Id.* at 3. Before the applicant is given the option of signing the Agreement, they must scroll through to the bottom; then, applicants are able to sign either by a pre-populated, cursive-type signature or by using their fingers to sign their name on the screen. *Id.* at 2-3. Instacart is provided with information

about the Shopper's consent to the Agreement, including the Shopper's IP address and time stamps that indicate when the Shopper reviewed and signed the agreement. *Id.* at 3. When Instacart updates the agreement, current Shoppers are prompted to review the updated Agreement in the Instacart app and are required to follow the same process to sign it. *Id.* at 2-3. O'Shea signed her operative Agreement on October 29, 2016; Posner signed his operative Agreement on August 11, 2019; and Bacon signed his operative Agreement on November 2, 2018. *Id.* at 3.

The plaintiffs' operative Agreements differ slightly; each, however, includes an agreement to arbitrate a broad range of claims arising out of the Shopper's relationship with Instacart and use of its various platforms. O'Shea's Agreement, signed in October 2016, states "**the Parties agree that to the fullest extent permitted by law any and all disputes, claims or controversies arising out of or relating to this Agreement or the Services performed by Contractor shall be resolved by final and binding arbitration by a neutral arbitrator** . . . ," including "**any and all claims or disputes arising out of relating to this Agreement, or the Services performed under this Agreement**." Def.'s Memo. Supp. Ex. 1.2 ¶¶ 7.1, 7.3. Similarly, Posner's and Bacon's operative Agreements read, "*the Parties agree that to the fullest extent permitted by law, ANY AND ALL DISPUTES OR CLAIMS BETWEEN YOU AND INSTACART shall be exclusively resolved by final and binding arbitration by a neutral arbitrator* . . . ." *Id.* Ex. 1.5 ¶ 8.1, Ex. 1.6 ¶ 8.1. Each operative Agreement also gave the Shopper a thirty-day window to opt-out of the arbitration provisions by notifying Instacart, in writing, of their intent to do so; none of the plaintiffs exercised the opt-out option in the operative Agreement governing their current claims.[1] *Id.* at 4-5, Ex. 1.2 ¶ 7.10 (O'Shea), Ex. 1.5 ¶ 8.10 (Posner), Ex. 1.6 ¶ 8.10 (Bacon).

---

[1] O'Shea and Bacon both signed an updated version of the Agreement in early 2020. As in earlier versions, the updated Agreement gave Shoppers the ability to opt-out of arbitration, and O'Shea and Bacon both exercised that option in February 2020. Pls.' Suppl. Br. Exs. 3, 4, ECF

3

The operative Agreements also include waivers of both class action and representative action claims. Each Agreement states that both Instacart and Shoppers "**agree that each may bring and pursue claims against the other only in their individual capacities, and may not bring, pursue or act as a plaintiff, class representative, or class member**," *see, e.g.*, *id.* Ex. 1.5 ¶ 8.4, or "**as a plaintiff or representative in any purported representative proceeding or action or otherwise participate in any such representative proceed or action other than on an individual basis**," *id.* Ex. 1.5 ¶ 8.5.

Before filing the instant motion, Instacart notified the plaintiffs' counsel of the plaintiffs' arbitration agreements, Def.'s Memo. Supp. 5, but Plaintiffs did not agree to submit to individual arbitration.

## DISCUSSION

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.,* states that, as a matter of federal law, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act further requires

---

No. 57. O'Shea and Bacon argue that, by updating the Independent Contractor Agreement, Instacart "offered Plaintiffs another bite at the apple" and that, by exercising the opt-out clause, the plaintiffs "opted *all* of their claims out of arbitration"—including the ones pending before this Court. *Id.* at 2. The major obstacle to this argument, however, is the updated Agreement itself, which clearly states that Shoppers who signed previous arbitration agreements with Instacart "remain bound by that prior arbitration agreement with respect to any such pending litigation or arbitration and must arbitrate any and all claims or disputes covered by that prior arbitration agreement." *Id.* Ex. 1 ¶ 9.6. O'Shea and Bacon ask this Court to adopt a tortured understanding of the term "litigation" (defined, by them, as "the resolution of the underlying merits in a court of law, but not procedural determinations of the validity of arbitration . . .") to avoid the plain meaning of Section 9.10(a). Their argument is unconvincing in light of the clear carve-out provision exempting pending litigation from a Shopper's ability to opt-out of arbitration. O'Shea and Bacon therefore remain bound by their agreement to arbitrate their current claims. *Accord Jordan v. Maplebear Inc. dba Instacart*, No. CGC-19-579780, at 3-5 (Cal. Super. Ct. June 26, 2020) (rejecting plaintiff's argument that exercising his opt-out option from the arbitration provision in Instacart's 2020 ICA precludes arbitration of pending claims that arose under an earlier version of the ICA).

courts to stay or dismiss proceedings and to compel arbitration if an issue in controversy is covered by a valid arbitration agreement. 9 U.S.C. §§ 3, 4; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (noting that the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed"). To compel arbitration under the FAA, this Court must find (1) that a written arbitration agreement exists between the parties; (2) that there is a dispute among the parties within the scope of the arbitration agreement; and (3) that one of the parties is refusing to comply with the arbitration agreement by declining to participate in arbitration. *See Zurich Am. Ins. Co. v. Watts Indus., Inc.,* 417 F.3d 682, 690 (7th Cir. 2005). In interpreting the breadth and viability of an arbitration provision, "as with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626 (1985).

### I. Under the FAA, the Court Must Grant Defendant's Motion for Arbitration.

The parties have agreed that the Independent Contractor Agreement is to be governed by the FAA. Def.'s Memo. Supp. Ex. 1.2 ¶ 8.1 ("The Parties expressly agree that this Agreement shall be governed by the Federal Arbitration Act"); Ex. 1.5 ¶ 8.1 (same); Ex. 1.6 ¶ 8.1 (same). Instacart argues that all three prerequisites for the Court to grant its motion to compel are satisfied here. First, there is a written arbitration agreement between plaintiff-Shoppers and Instacart. Each version of Instacart's Independent Contractor Agreement included an arbitration agreement; each plaintiff reviewed the Agreement and signed it before beginning to work as Shoppers through the Instacart platform. And though Instacart offered Shoppers an opportunity to opt-out of arbitration, none of the three plaintiffs exercised that option after signing the operative Agreements that govern their claims before this Court.

5

Second, the plaintiffs' claims fall within the scope of that arbitration agreement. Though the language differed slightly among the Agreements that the plaintiffs signed, each consented to arbitrate a seemingly exhaustive category of potential claims against Instacart: O'Shea to arbitrate "any and all disputes, claims or controversies arising out of or relating to this Agreement or the Services performed by Contractor," and Posner and Bacon to arbitrate "any and all disputes or claims between you and Instacart." *Id.* Ex. 1.2 ¶ 7.1 (O'Shea), Ex. 1.5 ¶ 8.1 (Posner), Ex. 1.6 ¶ 8.1 (Bacon). Courts interpret the scope of arbitration clauses "according to their plain meaning" and "strive for a commonsense result"; through this lens, nothing in the language of the Agreement can reasonably be read to exclude the plaintiffs' FLSA or other state and local claims against Instacart. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Trimas Corp.*, 531 F.3d 531, 536 (7th Cir. 2008) (a claim is presumed arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" and "any ambiguities in the scope of the arbitration clause are resolved in favor of arbitration"); *Gore v. Alltel Communs., LLC*, 666 F. 3d 1027, 1033 (7th Cir. 2012) ("We have previously said that 'arising out of' reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se.") (internal quotations omitted).

And, finally, the plaintiffs have declined to participate in arbitration proceedings. As plaintiffs do not contest that these criteria are met, "arbitration should be compelled." *Scheurer v. Fromm Family Foods LLC*, 863 F.3d 748, 752 (7th Cir. 2017).

### II. Plaintiffs Do Not Fall within the FAA's Section 1 "Transportation Worker" Exemption.

Plaintiffs argue, however, that the FAA's mandate to courts to enforce arbitration agreements, 9 U.S.C. § 2, does not apply here because plaintiff-Shoppers fall within the statute's

exemption for "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. They aver that Instacart Shoppers are encompassed by Section 1's residual clause because 1) Shoppers are engaged in the movement of goods from grocery store to customer; 2) Shoppers' work for Instacart relies on "hundreds of pieces of information [that] are transmitted across multiple state lines between the Shopper, Instacart, and the customer via the Instacart App"; and 3) Internet-based transactions are, per se, interstate commerce. Pls.' Memo. Opp'n 8-11. If the plaintiffs are correct and the Section 1 exemption applies to Instacart Shoppers, this Court lacks the authority to order arbitration. *New Prime Inc. v Oliveira*, 139 S. Ct. 532, 539 (2019).

Section 1 "exempts from the FAA only contracts of employment of transportation workers." *Circuit City Stores v. Adams*, 532 U.S. 105, 114-15, 119 (2001) (relying on the statutory interpretation maxim *esjusdem generis* to conclude that the scope of the residual clause must be "controlled and defined by reference to the enumerated categories of workers which are recited just before it": seamen and railroad workers). And, by statute, the category of "transportation workers" is itself narrowed to include only those workers "engaged in . . . interstate commerce." 9 U.S.C. § 1. In *Circuit City*, the Supreme Court concluded that the plain meaning of the phrase "engaged in commerce," as used in the residual clause, is narrower than other, more comprehensive jurisdictional phrases such as "affecting commerce" and "involving commerce." 532 U.S. at 118-19 (citing with approval, for example, the definition "persons or activities within the flow of interstate commerce").[2]

---

[2] The plaintiffs' argument that their work is an inextricable component of a series of interstate internet transactions, may, counterintuitively, support an even more expansive understanding of the types of employment contracts that fall within the FAA's scope. Section 2 of the FAA provides that an arbitration agreement in any "transaction involving commerce" is subject to the FAA. 9 U.S.C. § 2; *see also Perry v. Thomas*, 482 U.S. 483, 489 (1987) ("Section

In subsequent cases, circuit courts "have repeatedly emphasized that transportation workers are those who are 'actually engaged in the movement of goods in interstate commerce'" as a central part of their job description. *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 801 (7th Cir. 2020) (Barrett, J.). This requires line-drawing, and some worker categorizations are more straightforward than others—determining that interstate truckers fall within the exemption is an easy call; other employees, like non-driving support staff at an interstate trucking company, or delivery drivers responsible solely for the final, intrastate leg of an interstate route, present a much closer question. *See id.* at 801-02. Still, the "inquiry is always focused on the worker's active engagement in the enterprise of moving goods across interstate lines." *Id.* at 802. And qualifying workers "must be connected not simply to the goods" that travel across state or national lines, "but to the act of moving those goods across state or national borders," such that the class of workers themselves are "engaged *in the channels* of foreign or interstate commerce." *Id.*

---

2 . . . embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce" or is otherwise revocable under normal contract law principles). Courts have expressed differing opinions about whether independent contractor agreements for app-based local delivery drivers are covered by the FAA in the absence of an express provision invoking the FAA, like that in the Shopper's Agreement with Instacart. Defendants in these cases (*i.e.*, the companies being sued by the workers) have benefited from an understanding that app-based transactions implicate interstate commerce, while plaintiffs have prevailed when the focus is on the local nature of their work. *Compare, e.g.*, *Webb v. DoorDash, Inc.*, 451 F. Supp. 3d 1360, 1366 (N.D. Ga. 2020) (noting that DoorDash's Independent Contractor Agreement [ICA] would be subject to the FAA even if it were not expressly invoked because, in light of the national scope of DoorDash's business, the ICA "affect[s] commerce"); *with McGrath v. Doordash, Inc.*, No. 19-cv-05279-EMC, 2020 WL 6526129, at *5 (N.D. Cal. Nov. 5, 2020) ("In the instant case, it is debatable whether the contract at issue – the [Doordash] ICA – is one evidencing a transaction involving interstate commerce. According to DoorDash, the ICA falls under the FAA because the agreement "involves transactions and communications over email and the Internet . . . . But arguably the ICA is more about local delivery (local food delivery, in particular) than anything else."). Emphasizing Instacart Shoppers' reliance on an internet-based app to perform their shopping and delivery services may result in greater enforcement of arbitration agreements pursuant to Section 2 of the FAA. The debate is of no moment here, where the operative agreements expressly invoke the FAA, but the plaintiffs might be well-advised to consider whether they really want to go where their logic leads.

8

The plaintiffs contend that the Seventh Circuit's reasoning in *Wallace* supports their definition of "transportation worker," citing the "engaged in the channels of foreign or interstate commerce" language. *Id.*, *citing McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998); Pls.' Notice New Authority 2 (emphasizing the so-called "economic continuity" between Shoppers' use of the internet, a channel of interstate commerce, and Instacart deliveries). And they argue that the FAA exemption case law is too narrowly focused on the physical continuity of goods moving across state lines case law, blaming courts and litigants for "completely ignor[ing] whether the movement of goods was as an integral and inseparable part" of a series of interstate internet transactions, as here. Pls.' Memo. Opp'n 8-9. They urge this Court to break from other courts to "analyz[e] the essential character of the deliveries as a component of a larger series of Internet transactions" and recognize as dispositive "Instacart Shoppers' inseparability from the flow of commerce in the context of app-based ordering and delivery." *Id.* at 10.

But the Seventh Circuit's recent decision in *Wallace* dictates the outcome of this motion. In *Wallace,* the Court of Appeals squarely held that food delivery drivers for another web-based delivery service, Grubhub, do not fall within the class of transportation workers exempted from the FAA's application in Section 1. That determination controls here; drivers who deliver food purchased over the internet from a grocery store differ in no material way from drivers who pick up food purchased over the web from a restaurant, and the plaintiffs offer no basis to distinguish *Wallace* from this case.[3] To be sure, in *Wallace* the plaintiff drivers did not advance the same

---

[3] *Wallace* was decided after the original and a supplemental round of briefing had been completed, but the plaintiffs addressed *Wallace* in a submission of supplemental authority from other circuits. Pls.' Notice New Authority 2, ECF No. 61. They maintain that Instacart Shoppers are engaged in channels of interstate commerce because they must rely on internet communications to deliver goods. Notwithstanding their claim that their argument is consistent with *Wallace*'s emphasis on engagement in the channels of interstate commerce, in truth the argument seeks to substitute engagement in interstate communications with engagement in the interstate movement

argument that the plaintiffs advance here—namely, that their reliance on interstate communications brings them within the class of workers engaged in interstate commerce. But that argument does not help Shoppers evade the central teaching of *Wallace* (and of *Circuit City*, on which *Wallace* relies): that, in assessing whether the Section 1 exemption applies, "the inquiry is always focused on the worker's active engagement in the enterprise of moving goods across interstate lines." *Wallace*, 970 F.3d at 802. The centrality of this inquiry is not, as the Shoppers contend, the result of a lack of imagination or refusal to modernize; rather, it is the inquiry demanded by the statutory language, which exempts from the FAA only seamen, railroad workers, and a narrow class of workers engaged in fundamentally similar work.

That a class of workers is an "essential part of [a] larger series of interstate transactions," Pl.'s Memo. Opp'n 1, is not enough to bring those workers within the Section 1 exemption, so defined. Section 1's "engaged in commerce" language is necessarily "narrower than the more open-ended formulation . . . 'involving commerce'" found in Section 2, otherwise the distinction between the two sections would largely collapse. 532 U.S. at 118-19 (concluding the "text of § 1 precludes interpreting the exclusion provision to defeat the language of § 2 as to all employment contracts"). It follows that not every worker who transports goods in connection with an interstate transaction is also "active[ly] engage[d] in the enterprise of moving goods across interstate lines." *Wallace*, 970 F.3d at 802; *compare Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (concluding that Amazon Flex intrastate, last leg delivery drivers are exempt under Section 1 because the goods they deliver "remain in the stream of commerce until they are delivered"), *with Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1153 (N.D. Cal. 2015) (holding that local food delivery drivers are not

---

of goods—which, *Wallace* recognizes and holds, is the principal criterion for assessing whether the Section 1 exemption applies to the class of workers under consideration.

engaged in the interstate transport of goods, though the food may have originated across state lines). Such is the case here—though Instacart's business model may depend on a series of internet transactions connecting customers and Shoppers, neither Instacart nor Instacart Shoppers are engaged in enterprise of moving goods across state lines.[4]

Indeed, the interstate nature of Instacart transactions is largely accidental; it is a function of "how transactions over the internet work, generally," and not reflective of a purpose to move goods from State A to State B. *Jordan v. Maplebear Inc. dba Instacart*, No. CGC-19-579780, at 6 (Cal. Super. Ct. June 26, 2020); *see also* Pls.' Memo. Opp'n Ex. 4 ("[M]ost data you get or send on the Internet goes in packets which take more than 10 but less than 20 hops from origin to destination."). And if Section 1 exempted all those who move goods as a "component of a larger series of Internet transactions," it would encompass any number of workers, including, for example, a local pizza delivery driver dispatched after a customer places an online order—and the consensus among courts is that pizza (and other local food) delivery drivers do not fall within the Section 1 exemption. *See, e.g.*, *Saxon v. Southwest Airlines Co.*, No. 19 C 0403, 2019 WL 4958247, at *5 (N.D. Ill. Oct. 8, 2019) ("[P]izza-delivery drivers and the like are not transportation workers because no part of their work touches interstate commerce."); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020) ("[N]o pizza delivery person belongs to a 'class of workers

---

[4] The plaintiffs do not argue that they ever picked up groceries in one state and delivered them to another. To the contrary, they purport to assert claims on behalf of "individuals who performed personal shopping, delivery services, or both for Instacart in the State of Illinois." Compl. ¶ 27. It is also doubtful that an occasional foray across state lines would exempt an Instacart Shoppers from the FAA's reach; the residual clause in Section 1 applies to the "class of workers," and "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work." *Wallace*, 970 F.3d at 800. *See also Capriole v. Uber Techs.*, 460 F. Supp. 3d 919, 929-30 (N.D. Cal. 2020) (Uber drivers who occasionally cross state lines with riders are not "engaged in interstate commerce"); *McGrath*, 2020 WL 6526129, at *7 (same, with respect to DoorDash drivers).

11

engaged in foreign or interstate commerce.'"); *Simeon v. Domino's Pizza LLC*, No. 17 CV 5550, 2019 WL 7882143, at *4 (E.D.N.Y. Feb. 6, 2019) ("A pizza delivery driver making deliveries within a single borough in New York . . . is not engaged in 'foreign or interstate commerce.'"). As the Court noted in *Circuit City*, "the location of the phrase 'any other class of workers engaged in . . . commerce' in a residual provision, after specific categories of workers have been enumerated, undermines any attempt to give the provision a sweeping, open-ended construction." 532 U.S. at 118; *see also Wallace*, 970 F.3d at 801. Plaintiffs' proposed internet-focused approach to identifying "transportation workers" is squarely at odds with that holding. Fidelity to *Circuit City* and to *Wallace* compels the conclusion that Instacart Shoppers are not included within the class of "transportation workers" to which the Section 1 exemption applies.

### III. Plaintiffs Must Submit Their Claims for Individual Arbitration.

Finally, each of the plaintiffs' operative Agreements includes provisions in which the Shopper agrees to pursue any claims against Instacart only in their individual capacities, rather than as part of a class action or other representative matter. *See, e.g.*, Memo. Supp. Ex. 1.5 ¶¶ 8.4, 8.5. The FAA requires courts to "enforce arbitration agreements according to their terms," including terms specifying "*with whom* the parties choose to arbitrate their disputes and *the rules* under which that arbitration will be conducted." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (emphasis in original, citation omitted). This mandate includes enforcing terms reflecting the parties' intention "to use individualized rather than class or collective action procedures." *Id.* As such, the plaintiffs must submit their claims for individual arbitration.

\*   \*   \*

For the foregoing reasons, Defendant Instacart's motion to compel individual arbitration [30] is granted. This case is stayed pending notification from the parties that arbitration proceedings have terminated or the Court otherwise requires a report as to the status of those proceedings.

Dated: December 21, 2020

John J. Tharp, Jr.
United States District Judge